# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| LAWRENCE McCOY, TODD McDONALD, DONALD MEANY, ROBERT MERCIER, RICHARD, PATTERSON, GARY QUARLES, LAWRENCE SHUE, RICK TIDWELL, and STEVE WILLIAMSON,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>NORTH SLOPE BOROUGH,<br><br>　　　　　　　　Defendant. | Case No. 3:13-cv-00064-SLG |

## ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment.[1] This motion is opposed and Defendant cross-moves for summary judgment.[2] Oral argument on the motions was heard on July 25, 2013.

## FACTS

Plaintiffs Lawrence McCoy, Todd McDonald, Donald Meany, Robert Mercier, Richard Patterson, Gary Quarles, Lawrence Shue, Rick Tidwell, and Steve Williamson are former and current employees of Defendant, the North Slope Borough (NSB). Plaintiffs have all been employed as pilots, lead pilots, or as a coordinator in Defendant's Department of Search and Rescue (SAR). In addition to these positions, SAR is staffed by a Director and Deputy Chief, a Chief Pilot, and three support employees.

---

[1]Docket No. 69.

[2]Docket No. 82.

During the time period relevant to this litigation, which is April 29, 2008 until the present, McCoy was employed as the SAR coordinator, a SAR pilot, and a lead pilot.[3] McDonald, Meany, Quarles, Shue, and Tidwell were employed as SAR pilots.[4] Mercier and Williamson were employed as SAR pilots and lead pilots.[5] Patterson has been employed as the SAR coordinator, a SAR pilot, and the Chief Pilot.[6] Certain Plaintiffs are no longer employed in these positions by NSB. Plaintiffs all seek overtime compensation for the entire relevant time period to the extent they were then employed by NSB except Patterson is not seeking overtime compensation for the period after he became the Chief Pilot.[7]

SAR pilots are required to have a high school education or the equivalent, an FAA Airline Transport Pilot (ATP) License with multi-engine airplane or rotorcraft/helicopter rating, an FAA First Class Medical Certificate, an FCC Radio

---

[3]From the Court's review of the record, it appears that McCoy was the SAR coordinator from April 29, 2008 to June 18, 2010; a SAR pilot from June 19, 2010 to October 7, 2010; and a lead pilot from October 7, 2010 through at least the end of 2012.

[4]From the Court's review of the record, it appears that McDonald was a SAR pilot from May 17, 2010 to August 9, 2012; Meany was a SAR pilot from April 29, 2008 through at least the end of 2012; Quarles was a SAR pilot from April 29, 2008 through sometime in 2010; Shue was a SAR pilot from April 29, 2008 through June 27, 2012; and Tidwell was a SAR pilot from November 24, 2010 through approximately May 12, 2012.

[5]From the Court's review of the record, it appears that Mercier was a SAR pilot from April 29, 2008 to March 21, 2010 and a lead pilot from March 22, 2010 through at least the end of 2010; and Williamson was a SAR pilot from April 28, 2008 to January 14, 2009 and a lead pilot from January 15, 2009 until September 1, 2010, when he again became a SAR pilot.

[6]From the Court's review of the record, it appears that Patterson was the SAR coordinator from November 14, 2005 to March 3, 2009; a SAR pilot from March 4, 2009 to September 1, 2010; and the Chief Pilot beginning on September 2, 2010.

[7]*See* Ford Spreadsheet, Exhibit AL at 36, Notice of Filing of Exhibits, Docket No. 122.

Permit, 3,000 hours of total flight time, and 500 hours of Arctic or remote area flying experience.[8] SAR pilots must also be able to obtain an Alaska driver's license within six months of hire.[9] A SAR pilot's primary purpose is to "serve[] as Pilot-in-Command or Second-in-command in Borough aircraft [and] safely pilot[] assigned aircraft to and from destinations, and for search, rescue and medevac situations."[10] A SAR pilot who is not a lead pilot is called a line pilot.

Lead pilots are required to have the same education, experience, and certificates as SAR pilots, except they must have 4,000 hours of total flying experience and one year of management and supervisory experience.[11] According to their job description, a lead pilot's primary purposes are: 1) to "[a]ssist in the management and monitoring of operations and safety of NSB Search and Rescue flight crew as Pilot in Command of Borough operated aircraft;" 2) to "assist[] in development and implementation of flight crew training programs of NSB Search and Rescue (SAR) personnel;" and 3) to "assist[] in ensuring compliance with Federal Aviation Administration (FAA) and Borough regulations and policies."[12]

---

[8]North Slope Borough Job Description (Pilot) at 1-2, Exhibit 2, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[9]*Id.* at 2.

[10]*Id.* at 1.

[11]North Slope Borough Job Description (Lead Pilot), Exhibit 20 at 4, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[12]*Id.* at 3.

The SAR coordinator is required to have the same education, experience, and certificates as a SAR pilot.[13]  The SAR coordinator's primary purposes are to "[c]oordinate[] search and rescue efforts between the NSB Search and Rescue (SAR) Department and village, state and Federal search and rescue organizations; [and] serve[] as Pilot in Command in Borough aircraft."[14]

Defendant has treated SAR pilots, lead pilots, and the SAR coordinator as exempt employees for purposes of overtime wages.  In 1997, three of the SAR pilots questioned whether they were properly classified as exempt employees.  Although the Wage and Hour Division of the Department of Labor (DOL) conducted an investigation and did not agree with Defendant's position that its pilots were exempt,[15] nothing came of the investigation.

In 2004, the pilots and lead pilots approached Defendant about instituting a rotational schedule.  Defendant's Department of Law concluded that the SAR pilots were exempt employees and thus could work a rotational schedule.[16]  The rotational schedule required the SAR pilots and lead pilots to work a two weeks on/two weeks off

---

[13]North Slope Borough Job Description (Search & Rescue Coordinator/Pilot), Exhibit 24 at 2, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[14]*Id.*

[15]*See* Exhibit 14 at 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[16]Exhibit 16, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

schedule.[17] During their two weeks off, the pilots could be called back to work. During their two weeks on, the pilots were originally required to be available for a flight at all times, but in January 2012, the schedule was changed to monitoring the radio and being on call for 12-hour shifts.[18]

During their two weeks on, the pilots were not required to be at the SAR facility at all times but were required to be able to respond to a tone-out within 30 minutes. A tone-out is the tone transmitted on the SAR radio frequency to notify a pilot of a mission. The pilots could engage in other activities while waiting for a tone-out, except they could not, per federal regulation, drink alcohol within twelve hours of a flight. The pilots were also required to be aware of weather conditions while waiting for a mission. Plaintiffs checked the weather anywhere from every 30 minutes to every three to four hours. There is evidence in the record that "[t]he number of dispatch calls per day for each Plaintiff average[d] less than one call per day."[19]

The proposal for the rotational schedule stated that the salary would be based on 75 hours every two-week pay period, but that the SAR pilots would be working 168

---

[17]The SAR coordinator is a non-rotational position. The SAR coordinator works 9 a.m. to 5 p.m. Monday through Friday and is on call at other times. McCoy Deposition at 179, ln. 9 -180, ln. 7; 181, lns. 19-23, Exhibit E, Notice of Filing of Exhibits, Docket No. 96.

[18]Later in 2012, the rotational schedule was discontinued and a four days on/three days off schedule with 12-hour shifts was implemented.

[19]Exhibit R at 10, Notice of Filing of Exhibits, Docket No. 114; Affidavit of Robert Butcher and attached reports, Docket No. 198.

hours in each two-week pay period.[20]  In answer to an interrogatory, Defendant stated that "[p]ilots were paid for 52 weeks per year but were on duty only 75 hours per pay period, but generally worked only two weeks on, followed by two weeks off."[21]  Plaintiffs' payroll records indicate that they were paid based on working 75 hours per two-week pay period.[22]

While on the rotational schedule, the pilots accrued leave according to Defendant's personnel policies.[23]  However, it is undisputed that while on the rotational schedule, the pilots were not permitted to take leave.  Instead, the pilots were able to periodically cash out their leave so long as they maintained a specified minimum balance.[24]

Plaintiffs contend that they have been improperly classified as exempt employees and that pursuant to the Fair Labor Standards Act (FLSA) they should have been paid overtime for any hours more than 40 that they worked in a week.  They assert

---

[20]Exhibit 35 at 1, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[21]Exhibit 32 at 3, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[22]Exhibit 51, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[23]Although the record does not indicate exactly how much annual leave each Plaintiff accrued, employee welcome letters from 2009 and 2010 state that "[a]nnual leave, for all Rotational Employees, is accrued at .1154 hours per qualifying hours worked, up to a maximum of 75 hours per pay period."  Exhibit AF at 9, 31, Notice of Filing of Exhibits, Docket No. 122.

[24]See, e.g., McCoy Deposition at 65, line 17-18; Exhibit E, Notice of Filing of Exhibits, Docket No. 96.

they worked 168 hours a week during their rotation.  Plaintiffs' Second Amended Complaint also asserts a breach of contract claim under state law based on Defendant's alleged failure to pay Plaintiffs overtime and holiday pay, and a claim that Defendant failed to timely pay certain Plaintiffs the compensation they were due upon termination as required by AS 23.05.140.

In its Answer, Defendant asserts that Plaintiffs were exempt employees under the FLSA.  Defendant also asserts, as affirmative defenses, that Plaintiffs' damages are barred by the doctrine of unclean hands, that Plaintiffs have failed to mitigate their damages, that there were legitimate business reasons for all actions taken regarding Plaintiffs, and that Plaintiffs are barred from recovering any damages because they breached their duty of loyalty to their employer.[25]

Plaintiffs now move for summary judgment on their FLSA overtime claim, their breach of contract claim, and several of Defendant's affirmative defenses.  Defendant cross-moves for summary judgment on all of Plaintiffs' claims.  In the alternative, should the Court find that some or all of Plaintiffs were misclassified as exempt, Defendant moves for summary judgment that its conduct was not willful, that it did not act in bad faith, that Plaintiffs' overtime compensation should be calculated at a 50% premium, and that it is entitled to offset any overtime that may be owed to Plaintiffs by all its payments of compensation.

---

[25]Answer to Plaintiffs' Second Amended Complaint at 4-5, Docket No. 39.

**DISCUSSION**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[26] The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.[27] If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial.[28] In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.[29] "Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered."[30]

## I. FLSA Overtime Claim

The FLSA requires employers to pay employees one-and-a-half times the employee's regular rate of pay for hours worked above forty hours in a workweek, unless the employee is exempt.[31] "'FLSA exemptions are to be narrowly construed against . . . employers and are to be withheld except as to persons 'plainly and

---

[26]Fed. R. Civ. P. 56(c).

[27]*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[28]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[29]*Id.* at 255.

[30]*Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

[31]29 U.S.C. § 207(a) (1).

unmistakably within their terms and spirit.'"[32] "'An employer who claims an exemption from the FLSA bears the burden of demonstrating that such an exemption applies.'"[33] "'The criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act.'"[34] "The FLSA includes an exemption from the overtime requirement for 'any employee employed in a bona fide executive, administrative, or professional capacity[.]"[35] Whether an employee is exempt is a question of law.[36] But how an employee spent his working time is a question of fact.[37]

Defendant has raised three specific exemptions—the learned professional exemption, the highly compensated employee exemption, and the administrative exemption—which the Court addresses in turn below.

### A. Exemptions

#### 1. The learned professional exemption

Defendant contends that the SAR pilots are exempt because they are "learned professionals" under the FLSA. The applicable regulation provides as follows:

---

[32] *Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

[33] *Id.* (quoting *Klem v. County of Santa Clara, Calif.*, 208 F.3d 1085, 1089 (9th Cir. 2000)).

[34] *Id.* (quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002)).

[35] *Id.* (quoting 29 U.S.C. § 213 (a)(1)).

[36] *Bothell*, 299 F.3d at 1124.

[37] *Id.* (quoting *Webster v. Public Sch. Employees of Wash., Inc.*, 247 F.3d 910, 913 (9th Cir. 2001).

To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:

(1) The employee must perform work requiring advanced knowledge;

(2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.[38]

There is no dispute that the SAR pilots' primary duty is to fly Defendant's aircraft. The dispute here focuses on whether the SAR pilots meet the third element of the "primary duty" test, to which the Court will next turn.

A SAR pilot is required to have an ATP certificate or license. Defendant contends that an ATP certificate is customarily acquired by a prolonged course of specialized intellectual instruction.

The applicable regulation includes the following detail regarding this third element of the exemption:

The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. *The best prima facie evidence that an employee meets this*

---

[38]29 C.F.R. § 541.301(a); *Solis*, 656 F.3d at 1083-84.  A professional employee must also be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week. . . ."  29 C.F.R. § 541.300(a)(1).  There is no dispute that Plaintiffs meet the salary test.

*requirement is possession of the appropriate academic degree . . . [T]he learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.*[39]

The parties do not dispute the general route that a person takes to acquire an ATP certificate. The first certification level for pilots is the private pilot certificate. To be eligible for a private pilot certificate a person must be at least 17 years of age; be able to read, speak, and write English; receive a logbook endorsement from a certified instructor who either instructed the student or reviewed the student's home study; obtain a passing score on a multi-choice knowledge test covering areas such as weather, federal regulations, aircraft operating systems, flight maneuvers, emergencies, communications, flight planning, chart reading, navigation, and aerodynamics; receive flight training from an instructor; and pass a practical test with a flight instructor.[40]

After receiving a private pilot certificate, a person may then obtain an instrument rating, which allows a pilot to fly under Instrument Flight Rules. To obtain an instrument rating, a person must obtain a passing score on a multiple-choice test and receive a

---

[39]29 C.F.R. § 541.301(d) (emphasis added).

[40]14 C.F.R. § 61.103.

logbook endorsement from a certified instructor.[41]   Earning an instrument rating generally requires between 50 and 70 additional hours of in-flight instruction.[42]

After receiving an instrument rating, many pilots obtain a commercial certificate, which allows a pilot to receive compensation for flying.   To obtain a commercial certificate, a person must obtain a passing score on a multiple-choice test and receive a logbook endorsement from a certified instructor.[43]

A pilot may then obtain an ATP certificate.   To obtain an ATP certificate, a person must obtain a passing score on a multiple-choice test but is not required to receive an endorsement from a certified instructor.[44]   Michael Buckland, Defendant's aviation expert, testified that a person obtaining an ATP certificate is not required to do any classroom training, but may do as much as 170 hours of classroom training.[45]   Buckland stated that doing no classroom training was "wildly unrealistic" but that the regulations

---

[41]14 C.F.R. § 61.65.

[42]Buckland Report at 6, Exhibit 5, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[43]14 C.F.R. § 61.123.

[44]14 C.F.R. § 61.153.

[45]Buckland Deposition at 66, lns. 10-20, Exhibit 19, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.   Although Plaintiffs cite to Buckland's report and deposition testimony, they also argue that his testimony as to whether SAR pilots are exempt should be excluded because it is a legal conclusion, not a factual conclusion.  *See Cowan v. Treetop Entr., Inc.*, 120 F. Supp. 2d 672, 684 (M.D. Tenn. 1999) (excluding expert's opinion as to employee's "primary responsibility" because that term has specific legal meaning under the FLSA regulations).   For purposes of the instant summary judgment motions, the Court will consider Buckland's opinions as they relate to factual matters, as such opinions are admissible under Rule 702, Federal Rules of Evidence.

did not expressly require any classroom training.[46]  But in order to obtain an ATP certificate, a pilot must have extensive flying experience, including 1,500 total flying hours, 500 cross-country flying hours, 100 night-flying hours, and 75 hours of instrument flight time.  Plaintiff Patterson once stated that

> [w]hen compared to other qualifications, this rating is akin to a doctorate or other extended college degree . . . .  This certificate requires extensive aeronautical experience, knowledge and flight proficiency to attain.  On average it takes at least 5 years to attain at an average cost of $50,000.[47]

Buckland's report estimated that a pilot who met the qualifications required for a SAR pilot would have approximately 1,062 hours of training time, which in his opinion, was the functional equivalent of two-thirds of a bachelor of science degree.[48]

Defendant argues that there can be no dispute that the foregoing constitutes a prolonged course of specialized study because Plaintiffs could not safely fly aircraft had they not had this specialized instruction, which they obtained in ground schools, through self-study, or in the military.  Defendant argues that this specialized instruction is

---

[46]Buckland Deposition at 66, lns. 13-20, Exhibit 13, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[47]Exhibit H at 2, Notice of Filing of Exhibits, Docket No. 101.  Patterson has testified that when he referred to an ATP certificate being comparable to a doctorate, he meant "it compared to – it was the top rating compared to a commercial or private" rating and that he was not comparing the ATP certificate to an extended college degree.  Patterson Deposition at 169, ln. 2 - 171, ln. 13, Exhibit 31, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[48]Buckland Report at 3-4, Exhibit 5, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.  At his deposition, Buckland calculated the number of training hours, including classroom and flight training, to be significantly less than 1,062.  Exhibit 29, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

prolonged, given that a pilot has approximately 1,500 hours of classroom and dual instruction by the time he acquires an ATP certificate. Defendant argues that the fact that pilots do not have academic degrees does not mean that they do not meet the third requirement of the "primary duty" test because the learned professional exemption applies to nurses and accountants who do not have a special advanced academic degree[49] and the same should be true for pilots.

Defendant has, however, misread the regulation pertaining to nurses, which provides:

> Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.[50]

The regulation does not provide that all nurses are exempt, including those that do not have advanced academic degrees. Rather, it provides that those categories of nurses who have specialized training, such as a licensed practical nurse, are not exempt because they do not have the requisite "specialized advanced academic degree[.]"[51] The same is true of the SAR pilots; they have specialized training, but they do not have advanced academic degrees.

---

[49] 29 C.F.R. § 541.301(e)(2),(5).

[50] 29 C.F.R. § 541.301(e)(2).

[51] *Id.*

Defendant has also misread the regulation pertaining to accountants, which provides:

> Certified public accountants generally meet the duties requirements for the learned professional exemption. In addition, many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals. However, accounting clerks, bookkeepers and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals.[52]

Again, the regulation does not state that all accountants who do not have academic degrees are learned professionals. Rather, it states that uncertified accountants who perform duties similar to those of a CPA *may* be learned professionals. Such individuals more than likely have had a prolonged course of specialized intellectual instruction, even though they are not licensed as CPAs.

Defendant relies on *Paul v. Petroleum Equipment Tools Co.*[53] in support of its argument that the lack of academic degree does not mean that a SAR pilot is not a learned professional. There, the Fifth Circuit concluded that a pilot, who held an ATP certificate, was "engaged in a 'learned profession' and thus was employed in a professional capacity," even though the pilot did not have an advanced academic degree.[54] The court rejected the pilot's argument that "flying is only a mechanical art or skill", finding instead that "a pilot must acquire extensive knowledge of aerodynamics,

---

[52] 29 C.F.R. § 541.301(e)(5).

[53] 708 F.2d 168 (5th Cir. 1983).

[54] *Id.* at 171.

airplane regulations, airplane operations, instrument procedures, aeronautical charts, and weather forecasting."[55]   The court concluded that "[t]he foundation of a pilot's experience is indisputably extensive, formal, and specialized training."[56]

In *Kitty Hawk Air Cargo, Inc. v. Chao,* a Texas district court applied the reasoning of its circuit court and held that cargo pilots had acquired their knowledge through a prolonged course of specialized intellectual instruction, despite their lack of a college degree.[57]   But other courts have criticized the *Paul* decision.   In *Howard v. Port Authority of New York and New Jersey*, a New York district court stated that the *Paul* decision was "logically flawed" because "its conclusion about the 'customarily acquired' prong appears to rest solely on the inference that the knowledge required by the FAA certification, because of its advanced and technical character, necessarily must be attained by a prolonged course of specialized instruction and study."[58]   The *Howard* court explained that "if this prong of the learned professional exception could always be satisfied by showing that the required knowledge is sufficiently complex or specialized in substance, then this requirement, which pertains to the *means* by which such knowledge is attained, would lose all independent force."[59]

---

[55] *Id.* at 172.

[56] *Id.* at 173.

[57] 304 F. Supp. 2d 897, 900-01 (N.D. Tex. 2004)

[58] 684 F. Supp. 2d 409, 415 (S.D.N.Y. 2010).

[59] *Id.* (emphasis in original).

In *Pignataro v. Port Authority of New York and New Jersey*, the Third Circuit "declin[ed] to follow the reasoning of the *Paul* Court," in part because it was contrary to a decision by the DOL Review Board and "the Wage and Hour's Division's interpretation" of the learned professional exemption.[60] The question in *Pignataro* was whether the defendant's helicopter pilots had been properly classified as exempt professional employees.[61] The helicopter pilots were required to have 2,000 hours of flying time, a commercial helicopter pilot certificate with a helicopter instrument rating, an FAA second class medical certificate, knowledge of FAA rules and regulations governing helicopter flights, and a high school diploma or GED.[62] The court concluded that the helicopter pilots had been improperly classified as exempt "learned professional" employees because "[n]one of the certificates that helicopter pilots are required to have are academic degrees" and because pilots were not required to spend a significant amount of time in the classroom.[63] The court also relied on the fact that the Department of Labor has taken the position that pilots are not exempt professionals as well as the fact that the Department of Labor Review Board had determined in 2000 that

---

[60]593 F.3d 267, 271-73 (3rd Cir. 2010).

[61]*Id.* at 267.

[62]*Id.* at 269.

[63]*Id.* at 270; *see also Howard*, 684 F. Supp. 2d at 415 (holding that Port Authority had not established professional exemption for helicopter pilot because "Port Authority helicopter pilots obtain the required advanced knowledge through experience rather than academic study"). The *Pignataro* court also cited to the following dictionary definition of the term "academic": "relating to, or characteristic of a school or pertaining to liberal or classical rather than technical or vocational education." *Pignataro*, 593 F.3d at 270 n.5.

airline pilots are not learned professionals.[64] "The Board found that almost all of the professions delineated in the C.F.R. as 'professional' require college or graduate-level study (one exception being certain nursing degrees that require completing a college-like academic program)."[65] In contrast,

> the training of airline pilots in this country typically does not revolve around specialized college-type academic instruction, but more-closely resembles the classic apprenticeship model–a 'structured, systematic program of on-the-job supervised training;' coupled with a program of related instruction.[66]

In 2009, the DOL reiterated its "position that pilots are not exempt as learned professionals" because "aviation is not 'a field of science or learning' and . . . the knowledge required to be a pilot is not 'customarily acquired by a prolonged course of specialized intellectual instruction. . . .'"[67] But the DOL also reiterated that it "takes a position of non-enforcement with regard to pilots and copilots of airplanes and rotorcraft who hold [a] FAA Airline Transport Certificate or Commercial Certificate *and* who

---

[64]*Id.* at 270-71.

[65]*Id.*

[66]*Id.* (quoting *In re U.S. Postal Serv. ANET & WNET Contracts Regarding Review & Reconsideration of Wage Rates for Airline Captains and First Officers*, ARB Case No. 98-131, 2000 WL 1251361, at *16 (Dep't of Labor Admin. Rev. Bd. Aug. 4, 2000)).

[67]January 14, 2009 Wage and Hour Opinion Letter at 4, Exhibit 4, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69. Defendant's contention that this opinion letter only dealt with helicopter pilots is incorrect. The employer's pilots flew two jet aircraft and one helicopter and the Chief Pilot and the captains held "FAA Airline Transport Pilot Certification[s]." *Id.* at 1.

receive compensation on a salary or fee basis at a rate of $455 per week, *and* who are engaged in . . . [f]lying . . . aircraft as business or company pilots."[68]

Although neither *Pignataro* nor *Howard* involved pilots who had ATP certificates, but rather helicopter pilots who held commercial helicopter certificates with instrument ratings, this Court finds that to be a distinction without a difference. Buckland testified that at most an ATP pilot would attend 20 additional classroom hours in order to obtain an ATP certificate, but that attending ground school for an ATP certificate is not typical.[69] Thus, a pilot who obtains an ATP certificate has not had significantly more classroom time than a pilot who only holds a commercial license.

The Court is persuaded by the reasoning of *Pignataro* and the DOL Review Board and concludes that obtaining an ATP certificate or license does not require a prolonged course of "specialized intellectual instruction." The SAR pilots have received specialized training. And that training may have been quite prolonged.[70] But the SAR pilots' training was not a course of specialized *intellectual* instruction akin to an academic degree. Likewise, the training of the lead pilots and the coordinator was substantially the same as that of the SAR pilots. Thus, the SAR pilots, lead pilots, and coordinator do not meet the third requirement of the "primary duty" test.

---

[68]*Id.* at 3.

[69]Buckland Deposition at 60, ln. 12 - 61, ln. 7, Exhibit 19, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[70]There may be some dispute as to the number of training hours required to obtain an ATP certificate, but this is not a material factual dispute because even if the training is prolonged, the SAR pilots do not meet the third prong of the "primary duty" test of the learned professional exemption.

The "primary duty" test requires that all three elements be met. Because the Court finds that the knowledge of the SAR pilots is not "customarily acquired by a prolonged course of specialized intellectual instruction," it is not necessary to consider whether their knowledge is sufficiently "of an advanced type in a field of science or learning" for purposes of this exemption.[71] Defendant's SAR pilots, lead pilots, and coordinator do not satisfy the "learned professional" exemption.

### 2. Highly compensated employee exemption

Defendant contends that some of the Plaintiffs are exempt at least some of the time because they were highly compensated employees. "An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the [FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee. . . ."[72] "This section applies only to employees whose primary duty includes performing office or non-manual work."[73] "[T]o qualify as exempt as a highly compensated employee, [an employee] must satisfy *both* a salary and a duties test."[74]

---

[71] 29 C.F.R. § 541.301(a). However, it bears noting that the DOL has determined that "aviation is not a field of science or learning." *Pignataro* 593 F.3d at 270 (quoting Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22156 (Apr. 23, 2004) (citation omitted)). Further, "the Secretary of Labor's interpretation of his own regulation is controlling unless plainly erroneous or inconsistent with the regulation." *Id.* at 270 n.10 (quoting *Auer*, 519 US at 461).

[72] 29 C.F.R. § 541.601(a).

[73] 29 C.F.R. § 541.601(d).

[74] *Zubair v. EnTech Engineering P.C.*, 808 F. Supp. 2d 592, 599 (S.D.N.Y. 2011) (emphasis in original).

But, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."[75]

### a. Salary test

The regulation requires that a highly compensated employee's total annual compensation be at least $100,000. "Total annual compensation may . . . include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52–week period" but it "does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits."[76]

The parties dispute whether Plaintiffs' cashed-out leave should be included as compensation. The annual compensation of several of the pilots exceeds $100,000 only if the cashed-out leave is included. As noted above, while on the rotational schedule, Plaintiffs worked 26 weeks per year and were not allowed to take leave during the other 26 weeks. But they nonetheless accrued leave that they were allowed to, and did in fact, cash out at regular intervals.

Plaintiffs argue that their cashed-out leave is a "fringe benefit" that should not be included in their total annual compensation. A fringe benefit has been defined as "[a]

---

[75]29 C.F.R. § 541.601(c).

[76]29 C.F.R. § 541.601(b).

benefit (other than direct salary or compensation) received by an employee from an employer, such as insurance, a company car, or a tuition allowance."[77]

This Court finds that the cashed-out leave is not a fringe benefit, but rather is nondiscretionary direct compensation. It is nondiscretionary because Plaintiffs were not allowed to take leave while on the rotational schedule, and Defendant had to pay Plaintiffs for their accrued leave when they requested a cash-out, so long as the minimum required balance was maintained. And it constituted income that was reported as taxable wages on line 5 of the employees' W-2 forms. Further, it was paid directly to Plaintiffs, not to a third-party, such as an insurance company. The fact that the cashed-out leave is not included as "compensation" for purposes of PERS, the State of Alaska's Public Employees' Retirement Program in which Defendant's employees have participated, does not change this analysis. For unlike the FLSA regulation which includes "other nondiscretionary compensation" within total annual compensation, the PERS definition of "compensation" expressly excludes "payments for leave not used by the employee whether those leave payments are scheduled payments, lump-sum payments, donations, or cash-ins[.]"[78] Because the cashed-out leave is

---

[77] *Black's Law Dictionary* 167 (8th ed. 2004).

[78] Affidavit of Perla Halog at 3, ¶ 7, Exhibit U, Notice of Filing of Exhibits, Docket No. 115. (quoting Alaska Department of Administration, Division of Retirement and Benefits, Glossary of Terms and Acronyms, at http://doa.alaska.gov/drb/help/glossary.html).

nondiscretionary direct compensation, it should be included in Plaintiffs' wages in applying the salary test for higher compensated employees.[79]

### b. Duties test

In order to meet the highly compensated employee duties test, an employee's primary duty must be "performing office or non-manual work."[80]  In addition, the employee must "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee[.]"[81] The regulations define the phrase "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."[82]

Here, the parties have focused on the duties of an administrative employee. Under the regulations, there are two components to the duties of an exempt administrative employee:  "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's

---

[79]This Court rejects Defendant's argument that all of Plaintiffs' salaries should be pro-rated because they only worked 26 weeks per year.  The pro-rata regulation only applies if "the employee is newly hired after the beginning of the year or ends the employment before the end of the year[.]"  29 C.F.R. § 541.601(b)(3). The pro-rata regulation does, however, apply to Tidwell, McDonald, and Shue because they actually worked partial years. And it would apply to employees that worked in an exempt position part of the year, and in a non-exempt position other portions of the year, such as Patterson in 2010.

[80] 29 C.F.R. § 541.601(d).

[81]29 C.F.R. § 541.601(a).

[82]29 C.F.R. § 541.701.

customers;" and "the exercise of discretion and independent judgment with respect to matters of significance."[83]  For highly compensated employees, it is sufficient if one of these components is demonstrated.[84]

    *i.    SAR pilots*

The parties agree that the SAR pilots' primary duty is to fly planes.  But they disagree on whether that duty is non-manual work.  Plaintiffs contend that flying Defendant's aircraft is manual work; Defendant contends that it is non-manual work. The applicable regulation lists "non-management production line workers and non-management employees in maintenance, construction and similar occupations" as examples of manual workers.[85]  The regulation then lists several examples of manual workers:  "carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy."[86]

The materials submitted by Defendant with these motions make clear that flying an airplane is not manual labor.[87]  While the use of one's hands is required, it is the

---

[83] 29 C.F.R. § 541.200(a)(2)-(3).

[84] 29 C.F.R.§ 541.601(a).

[85] 29 C.F.R. § 541.601(d).

[86] 29 C.F.R. § 541.601(d).

[87] *See, e.g.* Exhibit I-16 at 5-50 to 5-61, "Making Decisions;"  Exhibit I-17 at 1-30, ("flying requires a continuous series of decisions" . . . with instrument flying "[y]ou are stepping up to a new level of flying, one when you must frequently make more complex decisions and utilize

non-manual decision-making that is the key to the successful operation of an airplane. This Court concludes that an ATP-licensed pilot flying an airplane is not performing work similar to the "blue-collar" occupations identified as manual work in the regulation, but rather is performing non-manual work of a highly technical nature that requires extensive and specialized training.[88]

For those SAR pilots whose income exceeded the requisite $100,000 per year, Defendant also needs to establish that those pilots were regularly and customarily performing at least one of the duties and responsibilities of an administrative employee. An exempt administrative employee is an employee

> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.[89]

The first primary duty, "'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this

---

additional resources through application of human factors principles."); Ex. I-35 ("flying involves decisions that are far more involved than most daily concerns. Since instrument and commercial flight demand complex decision making, your motivation and attitude as you make decisions are critical.")

[88] *See also* 29 C.F.R. § 541.3(a) and (b). There, the regulations distinguish between manual laborers and other "blue collar" workers and workers with occupations more similar to Plaintiffs' work, such as police officers, emergency medical technicians, fire fighters, state troopers, rescue workers, etc.

[89]29 C.F.R. § 541.200(a)(2)-(3).

requirement, an employee must perform work directly related to assisting with the running or servicing of the business[.]"[90]   In other words, "[t]his requirement is met if the employee engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs."[91]   Based on the record before this Court, the SAR pilots were not engaged in running the SAR itself or determining its overall course or policies.[92]

The second primary duty would exempt a highly compensated employee who "customarily and regularly performs" duties that involve "the exercise of discretion and independent judgment with respect to matters of significance."[93]   The regulation adds, "[t]he exercise of discretion and independent judgment implies that the employee has the authority to make an independent choice, free from immediate direction or supervision."  The work involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[94]   And "employees can exercise discretion and independent judgment

---

[90]29 C.F.R. § 541.201(a).

[91]*Bothell*, 299 F.3d at 1125 (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)).

[92] *See also* 29 C.F.R. § 541.3(b)(1) and (3)(first responders such as rescue workers are not exempt administrative employees "because their primary duty is not the performance of work directly related to the management or general business operations of the employer or the employer's customers as required under § 541.200.").

[93]29 C.F.R. § 541.202(a).

[94]29 C.F.R. § 541.202(a).

even if their decisions or recommendations are reviewed at a higher level."[95]  However, the regulation also states that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."[96]  The regulation regarding manuals explains that

> [t]he use of manuals, guidelines, or other established procedures containing or relating to highly technical, scientific, legal, financial, or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption . . . [but the] exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.[97]

The term "matters of significance" refers to the level of importance or consequence of the work performed.[98]

Defendant argues persuasively that the SAR pilots exercise discretion and independent judgment while piloting Defendant's aircraft and in flying missions. Plaintiffs point to the pilots' reliance on manuals, and assert that they demonstrate that they were not exercising discretion and independent judgment.  But in an emergency situation, a pilot would not consult a manual and simply apply "closely prescribed limits" and "well-established techniques" to determine the correct response.  Instead, the

---

[95] 29 C.F.R. § 541.202(c).

[96] 29 C.F.R. § 541.202(e).

[97] 29 C.F.R. § 541.704.

[98] 29 C.F.R. § 541.202(a).

manuals included in the record demonstrate just the opposite type of problem-solving approach—one that involves the pilot's careful exercise of independent judgment.[99] The case Plaintiffs cite, *Foster v. Nationwide Mut. Ins. Co.*, is inapposite.[100] There, the district court denied summary judgment to both parties with respect to the classification of special investigators for an insurance company. Plaintiffs had presented evidence that portrayed the investigators "as mere fact-gatherers who perform their investigative tasks in a highly routinized fashion, under the exacting supervision and the rigid constraints imposed by the [employer's] auditing system."[101] But this is not the case here for the SAR pilots, who must constantly exercise their discretion and independent judgment without direct supervision when they are flying aircraft. Further, flying an airplane to rescue or search for individuals is clearly a "matter of significance."

Defendant has demonstrated that the SAR pilots who earned in excess of $100,000 in a calendar year are exempt as highly compensated employees. Defendant is entitled to summary judgment with respect to those SAR pilots.

---

[99] See Exhibit I-17 at 1-31 ("Aeronautical decision making … is a systematic approach to the mental process used by aircraft pilots to consistently determine the best course of action in response to a given set of circumstances."); Ex. I-17 at 1-35 ("The decision-making process normally involves several steps in which you make choices based on a variety of factors, some beyond your control. By recognizing the elements you can control, you will improve your ability to make wise and effective decisions.").

[100] 695 F. Supp. 2d 748, 759 (S.D. Ohio 2010).

[101] 695 F. Supp. 2d at 759.

## ii. Lead pilots

For the same reasons that this Court found the highly compensated SAR pilots to be exempt, the lead pilots who earned in excess of $100,000 per year are also exempt, as Plaintiffs have maintained that the primary responsibility of these pilots was "the safe operation of SAR aircraft", which "is precisely the same as [the] primary duty [of] a line pilot."[102]  Likewise, Defendant's expert Buckland opined that the lead pilots' primary duty was not "clerical or administrative in nature" but rather was "to serve as a qualified professional pilot."[103]  Defendant is entitled to summary judgment that the SAR lead pilots who earned over $100,000 per calendar year are exempt as highly compensated employees.

## iii. SAR coordinator

The SAR coordinator position was a desk job, with a 9 a.m. to 5 p.m. Monday through Friday schedule.[104]  The SAR coordinator's job description provides that his essential duties include the following:  1) "[c]oordinates search and rescue operations as required"; 2) "[a]ssists with the maintenance and operation of NSB village volunteer search and rescue equipment"; 3) "[c]oordinates the training activities for Search and Rescue volunteers"; 4) [m]aintains and prepares search and rescue reports and logs"; 5) "[a]ssists volunteer organizations in processing documentation to proper authorities";

---

[102]Affidavit of Robert Mercier at 1-2, ¶ 2, Docket No. 70.

[103]Buckland Report at 11, Exhibit 5, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[104]McCoy Deposition at 179, ln. 9  -180, ln. 7; 181 lns. 19-23, Exhibit E, Notice of Filing of Exhibits, Docket No. 96.  The SAR coordinator was on call the rest of the time.

6) "[m]anages the Personal Locator Beacon (PLB) program and database"; 7) "[r]epresents the Borough in meetings. . ."; and 8) "[a]ssist[s] the Grants Division in application and administration of grant funding for NSB Search and Rescue and volunteers."[105]  On their face, these appear to be tasks that could fall within one or both of the primary duties for the administrative exemption.  But, as mentioned above, the Court must also consider how the SAR coordinator was actually performing his job.

McCoy testified that when the coordinator is made aware of a search, he contacts the local village search and rescue group to see if they are able to mount a search.[106]  If they are not, then SAR mounts a search.[107]  Williamson testified that the coordinator has the "initial obligation to identify essential pieces of information" for a search and rescue mission.[108] The coordinator also monitors the progress of the search and provides support if requested.[109]  Williamson testified that the SAR coordinator has to have good judgment because "[o]n a critical mission, . . . lack of a detail maybe could change the outlook and the result."[110]  McCoy also testified that as a coordinator he was

---

[105]Exhibit 24 at 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[106]McCoy Deposition at 186, lns. 5-22, Exhibit 22, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[107]*Id.* at 189, lns. 1-6.

[108]Williamson Deposition at 64, ln. 15 - 65, ln. 25, Exhibit C, Notice of Filing of Exhibits, Docket No. 91.

[109]McCoy Deposition at 188, lns. 7-14, Exhibit 22, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[110]Williamson Deposition at 66, ln. 25 - 67, ln. 5, Exhibit C, Notice of Filing of Exhibits, Docket No. 91.

responsible for administering an NPRA grant, which involved getting a "wish list" from the village volunteer groups as to what equipment they wanted, and then, after receiving the budget from the division manager, if there were sufficient funds, purchasing and distributing the equipment to the village groups.[111] He testified that he received information regarding expenditures from the village search groups after a search had been conducted, put this information on a form, and then submitted the form to the Alaska State Troopers.[112] McCoy also testified that he was responsible for registering the personal locator beacons (PLBs) every two years, for maintaining a record of where the PLBs were at any given time, and for sending the PLBs in for repairs.[113] And McCoy testified that he took part in "meet and greet" meetings in the villages when he first became the SAR coordinator to explain how the new PLBs worked and that he attended a couple of assembly meetings with the SAR director.[114] These are all office or non-manual tasks that are directly related to the management or general business operations of SAR. Further, McCoy testified that as the SAR coordinator he spent about 80 percent of his time on these tasks and only about 20 percent of his time flying.[115]

---

[111]McCoy Deposition at 225, lns. 2-8, Exhibit 22, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[112]*Id.* at 225, ln. 20 - 233, ln. 13.

[113]*Id.* at 236, ln. 21 - 242, ln. 18.

[114]*Id.* at 244, ln. 6 - 248, ln. 12; 250, lns. 5-25.

[115]*Id.* at 183, lns. 1-5.

The SAR coordinator performed non-manual work and meets the duties test for the highly compensated employee exemption. And the evidence shows that during the years that Patterson and McCoy were employed as the SAR coordinator, they each earned at least $100,000 per year.[116] Defendant is therefore entitled to summary judgment that Patterson and McCoy, while employed as the SAR coordinator, were properly classified as exempt given their duties and high compensation.

### 3. The administrative exemption

Although the parties have each briefed the potential applicability of this exemption for the lead pilots and SAR coordinators, Defendant has not asserted that it would apply to the line pilots.[117] Nor would such a position be consistent with the regulations, and particularly 29 C.F.R. § 541.3(b)(1) and (3). In light of this Court's ruling on the applicability of the highly compensated exemption to the lead pilots and SAR coordinator, resolution of the applicability of this exemption to those employees is unnecessary.

Based on the foregoing, Plaintiff is entitled to summary judgment with respect to the classification of the line pilots who earned less than $100,000 in a calendar year, including cashed-out leave (or pro-rated earnings based on period of employment.)[118]

---

[116]Halog Affidavit at 2, ¶¶ 5-6 and Attachment A thereto at 2-3, Exhibit U, Notice of Filing of Exhibits, Docket No. 115.

[117] *See* NSB's Opposition at 38-42 (Docket 83).

[118] But, as explained above, this Court rejects NSB's assertion that the proration should apply due to the 26-week work schedule.

These individuals are not exempt from overtime during those calendar years of earnings. Defendant is entitled to summary judgment with respect to the exempt classification of all Plaintiffs during any year in which that Plaintiff earned over $100,000.

### B. Liquidated damages

The FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."[119] The Ninth Circuit has held that "[t]hese liquidated damages represent compensation, and not a penalty. Double damages are the norm, single damages the exception."[120] "Courts have the discretion to deny an award of liquidated damages if the employer shows that it acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that its conduct did not violate the FLSA."[121] The issues of good faith and reasonableness are mixed questions of law and fact.[122]

---

[119] 29 U.S.C. § 216(b).

[120] *Chao v. A-One Medical Srvcs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003) (quoting *Local 246 Util. Workers Union v. S. Cal. Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996)).

[121] *Id.* (quoting 29 U.S.C. § 260).

[122] *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007).

In the fall of 1997, Defendant was asked to respond to a DOL inquiry regarding the overtime status of its pilots. In October of that year, Joel Rothberg, an assistant NSB attorney, stated that "[t]he opinion of the law department is that Search & Rescue pilots do not have exempt status under the FLSA."[123] Rothberg considered whether pilots would meet the "professional" exemption but determined that pilot training does not qualify "as advanced learning acquired by a prolonged course of specialized intellectual instruction."[124] Rothberg also noted that "[t]he FLSA requires that the work product of the exempt professional be predominantly intellectual and varied in character and be work which cannot be standardized in relation to a given period of time. Piloting an airplane does not satisfy this requirement."[125]

Soon after, Defendant obtained an opinion letter from independent counsel who opined that "[a]lthough there is a split of authority on the issue, we believe that it is defensible to take the position that the Borough's pilots are exempt as professionals."[126] This opinion was based primarily on the *Paul* case. On November 26, 1997, Defendant informed the DOL that it "believes that its pilot positions are exempt from the FLSA overtime requirements under the professional exemption" because "Borough pilots perform work which requires knowledge of an advanced type in a field of science" and because "the pilots routinely exercise independent discretion and judgment in the

---

[123]Exhibit 1 at 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[124]*Id.*

[125]*Id.* at 2.

[126]Exhibit 10 at 2, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

exercise of their primary duties."[127]   The DOL disagreed with Defendant's assertion that its pilots were exempt.  In April 1998, Defendant estimated that its liability for overtime for the past two years for its pilots was $324,000 and informed the DOL that it "was sticking to its position that the pilots are exempt employees."[128]   Although Defendant anticipated that either the employees or the DOL would file a lawsuit "seeking back overtime wages",[129] no such suit was filed at that time.

In 2004, the SAR pilots approached Defendant about instituting a rotational schedule.  Defendant's Personnel Department asked Defendant's Law Department to review the issue of whether the pilots were exempt because Defendant had an ordinance that required any rotational position be exempt from the FLSA's overtime provisions.  In a January 31, 2005 opinion letter, the Law Department concluded "that Borough pilots can work a rotational schedule because they are exempt professionals under § 213 of" the FLSA.[130]   This conclusion was based primarily on *Paul*, although Roxanne Rohweder, the assistant NSB attorney who drafted the opinion letter, acknowledged that there was "some risk in relying solely on" the *Paul* case, given that other courts and the DOL had taken a contrary position.[131]

---

[127]Exhibit 11 at 1-3, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[128]Exhibit 15 at 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[129]Exhibit 14, at 3, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[130]Exhibit 16 at 1, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[131]*Id.* at 3.

Based on the foregoing, Plaintiffs argue that there can be no dispute that Defendant did not act in good faith and did not have reasonable grounds for believing that its conduct as to the SAR pilots did not violate the FLSA. But here, the Court has granted summary judgment to the Defendant with respect to many of Plaintiffs' claims – albeit on a basis other than that on which the Defendant had primarily relied. And with respect to the line pilots, the Court is not convinced that there are no disputed facts as to this issue. For example, while a defendant's reliance on counsel can be evidence of good faith,[132] here Defendant did not share Rothberg's internal memo with its outside counsel.[133] And yet, the fact that Defendant did not share Rothberg's memo with its outside counsel could be viewed as a reasonable step to take if Defendant wanted a truly independent opinion from its outside counsel. There also may be, as Plaintiffs contend, some question as to whether Defendant only attempted to ascertain the law *after* the DOL had initiated its investigation in 1997.[134] In short, neither Plaintiffs nor Defendant is entitled to summary judgment on the issue of liquidated damages as to the

---

[132]*See Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 262 (D. Mass. 2011) ("Case law suggests that liquidated damages are to be awarded unless the employer shows that it relied on the advice of informed counsel or an opinion it solicited from the Department of Labor.").

[133]*See Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1193 (D. Colo. 2012) (quoting *Mumby v. Pure Energy Serv. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) ("to rely on advice of counsel to demonstrate good faith in [a] FLSA action, the employer must show 'full disclosure of the relevant facts to counsel'").

[134]*See Reich v. Southern New England Telecommunications Corp.*, 121 F.3d 58, 71 (2nd Cir. 1997) (good faith "requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them").

SAR line pilots because there are disputed issues of material fact as to Defendant's good faith defense.

### C. Willfulness

"The statute of limitations for a claim seeking unpaid overtime wages under the FLSA is generally two years."[135] "But if the claim is one 'arising out of a willful violation,' the statute of limitations is extended to three years."[136] To establish that an employer's violation of the FLSA was willful, an employee must prove that the employer "knew it was violating the FLSA or acted in reckless disregard of whether it was violating the FLSA."[137] "Whether a violation of the FLSA is willful is a question of fact[.]"[138]

Defendant moves for summary judgment on the issue of willfulness, urging the court to follow *Pignataro* on this issue. There, the trial court's summary judgment finding that the employer had not acted willfully was affirmed on appeal, in part because the employer had relied on its legal counsel's conclusion that the helicopter pilots were exempt, a conclusion which was supported by legal authority, namely the *Paul* case.[139] Similarly here, Defendant argues that it relied on the opinion of its legal counsel that the SAR pilots were exempt, an opinion that was based on the *Paul* case.

---

[135] *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1280 (11th Cir. 2008) (citing 29 U.S.C. § 255(a)).

[136] *Id.* (quoting 29 U.S.C. § 255(a)).

[137] *Pignataro*, 593 F.3d at 273.

[138] *Id.*

[139] *Id.*

"[A]n employer has not willfully violated the FLSA if it acts reasonably in determining its legal obligation."[140]   As discussed above in the section on liquidated damages, there are facts in dispute as to whether Defendant acted reasonably in determining that its employees were exempt.  The fact that Defendant consulted "with an attorney may help prove that [it] lacked willfulness" but "such a consultation is, by itself, insufficient to require a finding in favor of [Defendant].  The Court's operative inquiry focuses on the employer's diligence in the face of a statutory obligation, not on the employer's mere knowledge of relevant law."[141]   Defendant is not entitled to summary judgment on the issue of willfulness.

### D. Engaged to Wait or Waiting to be Engaged

Defendant argues that even if certain Plaintiffs were improperly classified as exempt employees, they did not work 24 hours per day during their two weeks on.

29 C.F.R. § 778.223(a) provides that "an employee must be compensated for all hours worked" and defines "hours worked"  as "[a]ll time during which an employee is required to be on duty or to be on the employer's premises or at a prescribed workplace[.]"[142]   29 C.F.R. § 785.15, which defines "on duty," clarifies that an employee is considered to be on duty and entitled to compensation while waiting for work if he is

---

[140] *Id.*

[141] *Mumby*, 636 F.3d at 1270.

[142] 29 C.F.R. § 778.223(a).

"unable to use [the waiting] time effectively for his own purposes[.]"[143]  That regulation adds that the "on duty" waiting time is typically "unpredictable," "usually of short duration" and "belongs to and is controlled by the employer."[144]

Under 29 C.F.R. § 785.14, "waiting time" may also be compensable.  That regulation provides that determining the compensability of waiting time involves an inquiry into whether "the employee was engaged to wait or . . . waited to be engaged."[145]  29 C.F.R. § 785.17 provides that an employee is considered to be working while "on call" if he is "required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes[.]"[146]  It also explains that "[a]n employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call."[147]

Plaintiffs contend that they were required to be "on duty" during their entire two weeks on.  In support of this contention, Plaintiffs cite to their own testimony that they understood that they were "on duty" while on rotation[148] and to their personnel forms

---

[143]29 C.F.R. § 785.15.

[144] 29 C.F.R. § 785.15.

[145] 29 C.F.R. § 785.15 (quoting *Skidmore v. Swift*, 323 U.S. 134 (1944)).

[146]29 C.F.R. § 785.17.

[147]29 C.F.R. § 785.17.  *See also* 29 C.F.R. § 785.22 (Duty of 24 hours or more).

[148]Meany Deposition at 29, lns. 14-20, Exhibit 34; Quarles deposition at 65, ln. 25 - 66, ln. 16, Exhibit 41; Williamson Deposition at 42, ln. 23 - 43, ln. 10, Exhibit 42; Shue Deposition at 41, lns. 6-16, Exhibit 43; McDonald Deposition at 83, lns. 2-15, Exhibit 44; Tidwell Deposition at 11,

which indicate that they were "on duty" for 24 hours per day.[149]  Plaintiffs also cite to a

November 6, 2011 safety audit of the SAR department which noted:

> Fatigue Risk Management System (FRMS) elements were not observed to be in place within SAR resulting in scheduling of pilots to be continuously "on-duty" without being released from their "instant contact" responsibility for periods of time up to and including fourteen (14) consecutive days.[150]

The audit further noted that SAR pilots "[w]hile rostered for the on-duty block of time . . .

are expected to remain in continuous radio contact with NSBSAR headquarters on a

twenty-four hour a day, seven day a week basis to the extent of having to sleep with

their VHF radio on and available for emergency communications."[151]  Plaintiffs assert

that this evidence shows that they were "on duty" for the entire two week rotation.

Plaintiffs acknowledge that the 2004 job description for a SAR pilot stated that the pilot

was "on an on-call status" instead of "on duty",[152] but Plaintiffs point out that in 2004,

the rotational schedule had not yet been adopted and that job descriptions after 2004 do

not contain this statement.[153]  Plaintiffs also argue that Defendant's suggestion that the

---

Ins. 2-10, Exhibit 45; Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[149]Exhibits 38-40, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[150]Exhibit 46 at 3, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

[151]*Id.* at 7.

[152]Exhibit G at 16, Notice of Re-filing of Exhibits, Docket No. 122.

[153]*Id.* at 28.

terms "on duty" and "on call" are interchangeable is meritless because both terms are expressly defined in the FLSA regulations.[154] While Plaintiffs concede that some of them may have testified that these terms were used interchangeably, they argue that does not change the fact that Defendant repeatedly referred to its pilots as being "on duty."

While the paperwork to which Plaintiffs cite does state that they were "on duty" during their two weeks on, there can be no dispute that Plaintiffs were not actively "working" most or all of twenty-four hours per day during the entire two weeks of each rotation. As such, Plaintiffs were not "on duty" as per 29 C.F.R. § 785.15.[155] Rather, Plaintiffs were "on call" under 29 C.F.R. § 785.17 during each two-week rotation; thus, their waiting time may be compensable under the FLSA if they were engaged to wait, rather than waiting to be engaged during their weeks on rotation.

The Ninth Circuit has held that time spent waiting for work is "compensable if the waiting time is spent 'primarily for the benefit of the employer and his business.'"[156] "'[T]he two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'"[157]

---

[154] 29 C.F.R. §§ 785.15 (defining "on duty"); 785.17 (defining "on call").

[155] *See* 29 C.F.R. § 785.15.

[156] *Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944)).

[157] *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 935 (9th Cir. 2004) (quoting *Berry v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994)).

### 1. Personal activities

> Courts have considered a number of factors in determining whether an employee Plaintiff had use of on-call time for personal purposes: (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities[;] (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time. Such a list is illustrative, not exhaustive. No one factor is dispositive.[158]

"Whether and to what extent employees are able to use on-call time for personal activities is a question of fact."[159] "However, whether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable overtime under the FLSA is a question of law[.]"[160]

It is undisputed that Plaintiffs did not have to live on Defendant's premises. And yet they were required to remain in Barrow during their two-week rotations. It is also undisputed that the 30-minute response time allowed Plaintiffs to go almost anywhere in Barrow while on call. However, the rest of the *Owens* factors are in dispute. As for the frequency of calls, Plaintiffs testified that they were frequently awakened by the radio and thus unable to get a full night's sleep, which is contrary to Defendant's

---

[158] *Owens*, 971 F.2d at 351.

[159] *Berry*, 30 F.3d at 1180.

[160] *Id.*

"investigative" report.[161]  Further, the number of call-outs Plaintiffs received may be less significant given that they had to be prepared to respond at all times, because their job involved the safe piloting of Defendant's aircraft, often in a harsh environment and at times in life-and-death situations.[162]  The 30-minute response time could be considered somewhat restrictive as there is evidence that the SAR pilots did not have to simply be at the SAR facility within 30 minutes of a tone-out, but that they had to be "on station, with a complete weather briefing and flight plan filed" within 30 minutes.[163]  As for shift trades, there is evidence that SAR pilots could trade shifts, but it is not clear whether this could be done easily or not.  Although Plaintiffs did not carry pagers, they were required to carry two cell phones and a radio, which could be viewed as making their on-call status less restrictive as they could leave the SAR facility while waiting for a mission; or it could be viewed as being highly restrictive because Plaintiffs were required to be in "instant contact"[164] at all times.  There is evidence that shows that Plaintiffs could engage in personal activities such as reading and watching television but that they could not go hunting, fishing, hiking, or swimming.  Yet there is also evidence

---

[161]Exhibits A and B, Butcher Affidavit, Docket No. 198.

[162]See *Brigham*, 357 F.3d at 938 (low number of call-outs had "lesser significance" because the "particular employees were responsible for the safety of thousands of people and, accordingly, had to be absolutely prepared to respond at all times (i.e., rested, sober, clothed, and otherwise able to race immediately to the trouble source if needed), without regard to how often they were actually called out").

[163]Exhibit 46 at 5, Plaintiffs' Reply re Summary Judgment and Opposition to Cross Motion, Docket No. 168.

[164]*Id.* at 3.

that some Plaintiffs were able to pursue their own personal business ventures or work at other jobs while on rotation, although how much time they really devoted to their own personal business is in dispute. Quarles avers that he did occasionally fly flights for his company while on rotation but that he did so with "the explicit approval of either the chief pilot or the director of SAR,"[165] a contention Defendant disputes. Tidwell testified that he occasionally made a phone call or sent a text or email pertaining to his own business while on rotation.[166] And there is evidence that Patterson worked for another company on days when he was on rotation,[167] a contention that Plaintiffs dispute.

### 2. Agreement between the parties

The Court's "analysis of the [on call] issue . . . does not end" with consideration of "[t]he degree to which the employees were free to engage in personal activities[.]"[168] The Court must also consider "the parties' agreement and its significance."[169] Case law in the Ninth Circuit "recognizes that an agreement cognizable for purposes of the FLSA overtime inquiry may arise by conduct. In *Owens*, for instance, [the court] explained that 'the Plaintiff mechanics in the present case may not have liked the company's formal call-in system, but by continuing to work, they constructively accepted the new

---

[165]Affidavit of Gary Quarles at 1, ¶¶ 1-2, Docket No. 170.

[166]Tidwell Deposition at 53, lns. 8-14, Exhibit D, Notice of Filing of Exhibits, Docket No. 94.

[167]Exhibit attached to Affidavit of Paula A. Zawodny, Docket No. 196.

[168]*Brigham*, 357 F.3d at 938.

[169]*Id.*

terms.'"[170]  "And in *Berry*, [the court] reiterated that a 'constructive agreement may arise if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy.'"[171]  "Whether there was an agreement between the employer and the employees that employees would receive compensation only for actual work conducted while on-call is . . . a question of fact . . . ."[172]

When Plaintiffs went on the rotational schedule in 2005, they understood that they would be "on duty" or available for missions up to 24 hours per day during their two weeks on.[173]  In other words, Plaintiffs understood that they would be available to work for up to 168 hours every two weeks, although the evidence also indicates that the parties anticipated the actual amount of time worked would be far less.  By continuing to work after implementation of the rotational schedule, Plaintiffs agreed that their bi-weekly paycheck was their compensation for the two weeks on.

If the parties had a constructive agreement, that

> assists the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work. An agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work. Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not

---

[170] *Id.* (quoting *Owens*, 971 F.2d at 355).

[171] *Id.* (quoting *Berry*, 30 F.3d at 1180).

[172] *Berry*, 30 F.3d at 1180.

[173] Exhibit 35 at 1, Plaintiffs' Reply re Summary Judgment and Opposition to Cross-Motion, Docket No. 168.

> merely waiting to work, may suggest the parties do not
> characterize waiting time as work.[174]

Here, what is not clear is whether the agreed-upon amount of compensation was intended to compensate Plaintiffs for being engaged to wait for the full 168 hours each week, or whether it was only intended to compensate them for the hours they were actually engaged to work during that week.

Further, as discussed above, many of the *Owens* factors are in dispute. Thus, the Court concludes that neither the remaining Plaintiffs nor Defendant is entitled to summary judgment on the issue of whether and to what extent those Plaintiffs' waiting time was compensable work time.

### E. The Fluctuating Work Week

Defendant contends that any retroactive overtime to which Plaintiffs may be entitled should be calculated using the fluctuating work week (FWW) methodology. The concept, if not the name, of the FWW methodology originated in *Overnight Motor Transportation Company v. Missel*.[175] There, "[t]he Court held that when calculating the 'regular rate' of pay for an employee who agreed to receive a fixed weekly salary as payment for all hours worked, a court should divide the employees' fixed weekly salary by the total hours worked in the particular workweek."[176]  "*Overnight Motor* stated that an employer and employee could legally agree, in certain circumstances, to a

---

[174]*Brigham*, 357 F.3d at 939 (quoting *Berry*, 30 F.3d at 1180-81).

[175]316 U.S. 572 (1942).

[176]*Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

compensation arrangement where the employee would be paid a flat weekly rate for fluctuating hours."[177] "In 1968, the Department of Labor (DOL) promulgated 29 C.F.R. § 778.114, an interpretive rule intended to codify the Supreme Court's decision in *Overnight Motor.*"[178] "The rule states that overtime hours under the method may be compensated at a premium of one-half the employee's 'regular' rate, which in turn may fluctuate on a weekly basis."[179] Under the FWW methodology, the employee is presumed to have already been paid at the regular rate for each hour that he worked, including each hour over forty. He is thus only entitled to be paid an additional 50% premium for any hours worked over forty, as opposed to being paid a 150% premium for any hours worked over forty. The Fourth, "First, Fifth, Seventh, and Tenth Circuits all have determined that a 50% overtime premium [is] appropriate in calculating unpaid overtime compensation under 29 U.S.C. § 216(b) in mistaken exemption classification cases, so long as the employer and employee had a mutual understanding that the fixed weekly salary was compensation for all hours worked each workweek and the salary provided compensation at a rate not less than the minimum wage for every hour worked."[180]

---

[177] *Russell v. Wells Fargo and Co.*, 672 F. Supp. 2d 1008, 1011 (N.D. Cal. 2009).

[178] *Id.*

[179] *Id.* at 1012.

[180] *Desmond*, 630 F.3d at 354, 357.

Plaintiffs, however, urge the Court to follow the holding in *Russell v. Wells Fargo and Company*,[181] a Northern District of California case. One of the issues in that case was "[w]hether the concurrent payment of overtime pay is a required element to compute unpaid overtime by the FWW method, such that the FWW method of overtime calculation cannot be used in an exempt/non-exempt misclassification case."[182] The defendants argued "that the FWW method is available when the employer and employee have a clear mutual understanding that a fixed salary will compensate the employee for all hours worked in a week, including those in excess of the FLSA's forty-hour maximum, even if the 'understanding' is based on the employer's erroneous premise that the employee is exempt and thus not entitled to overtime pay."[183] The court rejected the defendants' argument. The court explained that the FWW regulation "contains legal prerequisites, which employers must first satisfy to use the discounted overtime rate available through the FWW method. These prerequisites include (1) a clear mutual understanding that a fixed salary will be paid for fluctuating hours, *apart from overtime premiums;* and (2) the contemporaneous payment of overtime premiums."[184] The court concluded that neither of these prerequisites can be met in a misclassification case because an "effective clear mutual understanding is absent" and

---

[181]672 F. Supp. 2d 1008.

[182]*Id.* at 1009.

[183]*Id.* at 1013.

[184]*Id.* (emphasis in the original).

"overtime compensation was not provided contemporaneously."[185]  Other district courts

have reached the same conclusion as the *Russell* court, although the Ninth Circuit has

not directly addressed the issue.[186]

This Court is persuaded by the reasoning of those district courts that have

concluded that the FWW method should not be applied in a misclassification case,

particularly in light of the FLSA's remedial purpose.  Here, the evidence demonstrates a

mutual understanding that Plaintiffs' fixed bi-weekly salary would serve as

compensation for Plaintiffs' employment with Defendant.  But there was no clear mutual

understanding that the fixed salary was intended as compensation, apart from overtime

premiums for the hours worked each workweek—rather, it was intended as full

compensation for the work week.  And there was no contemporaneous provision for

overtime pay. Of course, if the trier of fact determines that the remaining Plaintiffs were

waiting to be engaged and worked less than 40 hours per week, then no overtime

compensation is due.  But if it is determined that the remaining Plaintiffs were waiting to

be engaged during the entire two-week rotation, then the remaining Plaintiffs are due

compensation at the rate of time and one-half for overtime up to 168 hours per week,

---

[185]*Id.* at 1014.

[186]*Zulewski v. Hershey Co.*, Case No.  CV 11–05117–KAW, 2013 WL 633402, at *6 (N.D. Cal. Feb. 20, 2013) ("the retroactive application of the FWW method in the misclassification context does not square with [*Overnight Motor*], because [*Overnight Motor*] requires an agreement between the parties that the fixed weekly salary was compensation for all straight time [and] such an agreement is not present in misclassification cases"); *Blotzer v. L-3 Communications Corp.*, Case No. CV–11–274–TUC–JGZ, 2012 WL 6086931, at *11 (D. Ariz. Dec. 6, 2012) (citation omitted) ("attempting to retroactively apply the FWW method to a miscalculation case is akin to the old square peg in a round hole problem [because it requires] apply[ing] § 778.114 to a situation it was not intended to address").

less any appropriate offsets.[187]  Accordingly, Defendant's motion for summary judgment on the fluctuating workweek is denied.

### F. Offset

Defendant argues that if the Court determines that Plaintiffs are entitled to overtime compensation, an offset of damages would be appropriate.  Specifically, Defendant seeks to apply all of the compensation that was paid to Plaintiffs to any overtime owed.  Plaintiffs generally worked only two out of every four weeks throughout the year, but were paid for 75 hours every two weeks, or 37.5 hours every week.  In their damages calculations, Plaintiffs do not appear to have credited the compensation they received for 37.5 hours of work for each of the 26 weeks per year when Plaintiffs were not on rotation.  Defendants argue this compensation should be credited in any overtime calculation.

"Pursuant to the FLSA, an employer may credit some payments it has already made to employees against the overtime it owes them."[188]  "Specifically, there are three categories of payments which may be credited against overtime compensation mandated by the FLSA."[189]  Employers may "receive credit for 'extra compensation provided by a premium rate' for hours worked 'in excess' of an employee's regular

---

[187] Indeed, it is difficult to characterize Plaintiffs' work schedules as "fluctuating" if they are found to have been engaged to wait the full 168 hours each and every week that they were on rotation.

[188] *Conzo v. City of New York*, 667 F. Supp. 2d 279, 289 (S.D.N.Y. 2009).

[189] *Id.* (citing 29 U.S.C. § 207(h)(2)).

working hours."[190]  "Second, employers receive credit for 'extra compensation provided by a premium rate' of one and one-half times the regular rate paid for non-overtime work performed on weekends, holidays, and other days of rest."[191]  "Third, employers receive credit for 'extra compensation provided by a premium rate' of one and one-half times the rate paid for non-overtime work performed outside the regular workday or workweek."[192]  The offset that Defendant seeks here does not appear to fall within any of these categories.

Here, Plaintiffs received compensation for 75 hours straight time every two weeks.  While Defendant may not be entitled to an "offset" as that term is defined in the FLSA, in calculating any overtime due, Defendant will be given credit for 75 hours of straight time during each week that the SAR pilot was on duty, rather than the 40 hours that Plaintiffs have used to calculate the overtime they claim they are due.[193]

## II.  Breach of Contract Claim

Plaintiffs' breach of contract claim is based on two regulations in Defendant's Personnel Rules and Regulations.  The first regulation provides:

> An employee who is eligible for overtime compensation within the Fair Labor Standards Act and who is required to work in excess of 40 hours is compensated for hours worked

---

[190] *Id.* (quoting 29 U.S.C. § 207(e)(5)).

[191] *Id.* (quoting 29 U.S.C. § 207(e)(6)).

[192] *Id.* (quoting 29 U.S.C. § 207(e)(7)).

[193] There may also be a need to adjust for time spent on the job during the two weeks off when a pilot was called back to work.  *See*, e.g., Docket 168-7 at 2 (schedule proposal) ("All simulator training must be planned during off duty times.").

in excess of 40 hours at one and one-half times the
employee's normal hourly rate of pay.[194]

The second regulation provides that "hourly employees, except nonpermanent
employees, who are required to work on a Borough holiday are entitled to receive
holiday pay in addition to their regular pay for hours worked."[195]   In Alaska, "employee
policy manuals may modify at-will employment agreements, and . . . whether a given
manual has modified an at-will employment agreement must be determined on the
particular facts of each case."[196]   Plaintiffs contend, and Defendant does not dispute,
that because they were required to sign a document indicating that they had been
advised of their responsibility to read Defendant's Personnel Rules and Regulations,
that the Rules and Regulations constitute a separate promise to pay overtime and
holiday pay.   Plaintiffs have acknowledged that the success of their breach of contract
claim as to unpaid overtime depends on the success of their FLSA claims.[197]

Defendant argues that Plaintiffs' breach of contract claim as it pertains to
overtime is preempted by the FLSA.   "There are three 'categories' of preemption:

---

[194]Exhibit 26 at 9, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[195]*Id.* at 8.

[196]*Jones v. Central Peninsula General Hosp.*, 779 P.2d 783, 787 (Alaska 1989).

[197]*See*, *e.g.*, Exhibit AK at 2, Notice of Filing of Exhibits, Docket No. 119.   Although this
admission makes no distinction between overtime and holiday pay, Plaintiffs' admission can
only apply to their breach of contract claim as it pertains to overtime as the FLSA does not apply
to holiday pay.

express, field, and conflict."[198]  Only conflict preemption is at issue in this case.  "There are two types of conflict preemption: (1) 'where it is impossible to comply with both state and federal requirements'; and (2) 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[199]

In *Anderson v. Sara Lee Corporation,* the Fourth Circuit held "that Congress prescribed exclusive remedies in the FLSA for violations of its mandates" and thus "FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle preemption."[200]  The court observed that its "conclusion is consistent with the rulings of several district courts deeming state claims to be preempted by the FLSA where those claims have merely duplicated FLSA claims."[201]  The court also focused on the differences in the statute of limitations between FLSA claims and state law claims.[202]

Similarly, here Defendant argues that Plaintiffs' breach of contract claim should be preempted because it is duplicative of their FLSA claim and because different statutes of limitations apply to the two claims.  The FLSA provides for a two-year statute of limitations unless there is a finding of willfulness, in which case a three-year statute of

---

[198] *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 760 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S. Ct. 74 (2011).

[199] *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1152 (9th Cir. 2000) (quoting *Industrial Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997)).

[200] 508 F.3d 181, 194 (4th Cir. 2007).

[201] *Id.* (collecting cases).

[202] *Id.* at 192-93.

limitations applies. This "two-tiered statute of limitations[] makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations."[203] Because an Alaska breach of contract claim is subject to a three-year statute of limitations, Defendant argues that Plaintiffs' breach of contract claim would frustrate Congress' intent to make a distinction between willful and nonwillful violations of the FLSA.

Plaintiffs argue that Defendant's reliance on *Anderson* is misplaced because the Ninth Circuit rejected *Anderson* in *Wang v. Chinese Daily News, Inc*. There, the plaintiffs alleged, among other things, that they had been "made to work in excess of eight hours per day and forty hours per week."[204] In addition to asserting a FLSA claim, the plaintiffs also asserted a claim based on "California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200."[205] A § 17200 claim "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200."[206] The *Wang* "[p]laintiffs' § 17200 claim 'borrowed' FLSA as the substantive violation."[207] The Ninth Circuit held that the plaintiffs' § 17200 claim was not preempted because compliance with both the FLSA and the state law was possible as "the state and federal requirements are the

---

[203] *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 (1988).

[204] *Wang*, 623 F.3d at 749.

[205] *Id.*

[206] *Id.* at 758-59 (citation omitted).

[207] *Id.* at 759.

same" and allowing the § 17200 claim to go forward would further FLSA's purpose of protecting employees.[208]  The Court declined to follow *Anderson* because it relied on an earlier Fourth Circuit case that did not concern federal preemption of a state law claim but rather was "'about whether another federal statute (Section 1983) can support a claim that clearly falls under the FLSA.'"[209]

Although the judgment in *Wang* has been vacated[210] and thus *Wang* "has no precedential effect," it still has informational and persuasive value.[211]  *Wang* stands for the proposition that a state law claim is not preempted by the FLSA as long as that claim furthers the FLSA's purpose of protecting employees.  The *Wang* court explained that in the past, the Ninth Circuit had "relied on the principle that FLSA sets a floor rather than a ceiling on protective legislation[.]"[212]  The Court finds the reasoning of *Wang* persuasive and concludes that Plaintiffs' breach of contract claim as to the overtime issue is not preempted by the FLSA.

In light of the foregoing, Defendant is entitled to summary judgment on Plaintiffs' unpaid overtime breach of contract claims as to those pilots that this Court has found to

---

[208]*Id.* at 760.

[209]*Id.* (quoting *Williamson*, 208 F.3d at 1153).

[210]The judgment in *Wang* was vacated on other grounds; it was not vacated because of the Ninth Circuit's analysis of the preemption issue.

[211]*United States. v. Joelson*, 7 F.3d 174, 178 n.1 (9th Cir. 1993).  The  Ninth Circuit continues to cite to *Wang.  See Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525, 529 n.3 (9th Cir. 2013).

[212] *Id.* at 759 (citing *Pacific Merchant Ship. Ass'n v. Aubry*, 918 F.2d 1409, 1425 (9th Cir. 1990)).

be exempt under the highly compensated regulations, as discussed above.  Defendant is not entitled to summary judgment on the exempt employees' holiday pay breach of contract claim.

Plaintiffs are not entitled to summary judgment on their breach of contract claim as to those pilots that were improperly classified as exempt employees as there are material facts in dispute as discussed herein.  As for the holiday pay issue, Plaintiffs have failed to meet their burden of showing that there are no facts in dispute as they have made an inadequate factual presentation on this portion of their breach of contract claim.

## III.    AS 23.05.140 Claim

Defendant argues that it is entitled to summary judgment on the AS 23.05.140 claim brought by Quarles, Tidwell, and McDonald.  In *Hallam v. Holland America Line, Inc.*, the Alaska Supreme Court interpreted AS 23.05.140 and explained that it "mandates that where an employer terminates a worker, 'regardless of the cause for the termination, payment is due within three working days after the termination.'"[213]  "The statute proceeds to define the penalty for an employer 'failing to pay within the time required' as 'the amount of the employee's regular wage, salary, or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount.'"[214]  Quarles, Tidwell, and McDonald seek 90 days of "penalty pay"

---

[213]*Hallam v. Holland America Line, Inc.*, 180 P.3d 955, 960 (Alaska 2008) (quoting AS 23.05.140).

[214]*Id.* (quoting AS 23.05.140(d)).

on the grounds that Defendant failed to pay them the overtime they maintain that they were due within three days of the termination of their employment.

In *Hallam*, the Court explained that AS 23.05.140 requires a demand for payment.[215] It held that "the trial court did not err in its determination that Hallam and the class members were required at the least to make a demand for" timely payment of their seasonal bonus.[216] Plaintiffs assert that they have made a demand for payment because "[a] lawsuit is a demand in its sharpest form[.]"[217] However, in *Hallam*, the plaintiff had filed a pro se complaint alleging a claim under AS 23.05.140, which the Court did not count as the requisite "demand" under the meaning of the statute.[218] Plaintiffs here have not provided evidence of any other demand for payment to Defendant that could meet the requirements of AS 23.05.140. Accordingly, the Court finds that there is no genuine issue of fact as to this claim and that summary judgment should be granted to Defendant on this claim.

## IV. Other Affirmative Defenses

Plaintiffs argue that they are entitled to summary judgment on the following three affirmative defenses because Defendant has failed to state the basis for these

---

[215] *Hallam* involved an allegedly untimely payment of a seasonal bonus, not overtime wages, but AS 23.05.140 makes no distinction between different types of compensation owed. *See* AS 23.05.140 ("*all wages, salaries, or other compensation for labor or services* become due immediately") (emphasis added).

[216] *Id.* at 960-61.

[217] *OfficeMax Inc. v. Sousa*, 773 F. Supp. 2d 190, 232 (D. Me. 2011).

[218] *Hallam,* 180 P.3d at 957.

defenses: 1) Plaintiffs' damages are barred by the doctrine of unclean hands, 2) Plaintiffs have failed to mitigate their damages, and 3) there were legitimate business reasons for all actions taken regarding Plaintiffs. The Court cannot conclude based on Plaintiffs' cursory arguments that they are entitled to summary judgment on any of these defenses. Plaintiffs also argue that Defendant's affirmative defense that Plaintiffs are barred from recovering any damages because they breached their duty of loyalty to their employer is frivolous and should be dismissed. In answer to an interrogatory, Defendant stated that it was a breach of Plaintiffs' fiduciary duties to request damages for time that they did not work or for wages that they are not owed.[219] Plaintiffs argue that this defense is tantamount to retaliation as Defendant is arguing that they breached their duty of loyalty by pursuing their FLSA claim, but raising a defense during litigation is not retaliation.[220] Plaintiffs are not entitled to summary judgment on this defense.

## CONCLUSION

Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part as follows:

1.      Plaintiffs are granted summary judgment that those pilots who were compensated less than $100,000 per calendar year were improperly classified as exempt employees under the FLSA.

---

[219]Exhibit 28 at 4, Plaintiffs' Motion for Partial Summary Judgment, Docket No. 69.

[220]*See Harmar v. United Airlines, Inc.*, Case No. 95 C 7665, , 1996 WL 199734 at *2 (N.D. Ill. April 23, 1996) ("Presenting an affirmative defense, even a frivolous one, will not support a retaliation claim.").

2.     Plaintiffs' motion for partial summary judgment is otherwise denied.

Defendant's motion for summary judgment is GRANTED in part and DENIED in part as follows:

1.     Defendant is granted summary judgment that any Plaintiff that earned $100,000 during a calendar year or more is a highly compensated exempt employee during that year.

2.     Defendant is granted summary judgment dismissing Plaintiffs' breach of contract claim as to unpaid overtime as it pertains to the highly compensated exempt employees.

3.     Defendant is granted summary judgment that in calculating any offset, it will be given credit for 75 hours of straight time during each week that the SAR pilot was on duty.

4.     Defendant is granted summary judgment as to the AS 23.05.140 claim brought by Quarles, Tidwell, and McDonald.

5.     Defendant's motion for summary judgment is otherwise denied.

It is further ordered that within 7 days of the date of this ruling, Defendant shall identify each Plaintiff and time period during which it asserts the highly compensated employee exemption is applicable.   Plaintiffs shall file a response within 7 days thereafter.

DATED at Anchorage, Alaska, this 26th day of August, 2013.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE